## IN THE UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF TEXAS HOUSTON DIVISION

| | | |
|---|---|---|
| **SARAH OSBORN** and<br>**TERRY OSBORN**,<br><br>*Plaintiffs*,<br><br>v.<br><br>**HOUSTON INDEPENDENT<br>SCHOOL DISTRICT**; **F. MIKE<br>MILES**, Superintendent, in his<br>official and individual capacities;<br>**MICHAEL NIGGLI**, Principal,<br>Bellaire High School, in his official<br>and individual capacities; and<br>**SARAH RAY**, Counselor, Bellaire<br>High School, in her official and<br>individual capacities,<br><br>*Defendants*. | § § § § § § § § § § § § § § § § § | Civil Action No. <u>4:25-cv-02918</u> |

### VERIFIED COMPLAINT

1.      When Sarah and Terry Osborn's daughter was a 14-year-old freshman at Bellaire High School, her theater teacher asked what pronouns to use to refer to her. The Osborns told the teacher that she should use female pronouns to refer to their daughter.

2.      They thought that was the end of the matter. But during her sophomore year, the Osborns discovered that Houston Independent School District ("HISD") refused, as a matter of HISD policy, to follow their instructions regarding their own daughter. Multiple HISD employees—including the theater teacher—had been referring to their daughter as a boy during the school day. They called her by a masculine name. And they used male pronouns to refer to her.

3.      As part of that policy, neither HISD nor any of its employees notified the Osborns or sought their consent before treating their daughter as a boy. The

Osborns only discovered HISD's actions because they found schoolwork that referred to their daughter by a masculine name.

4.    Upon discovering that HISD was not following their instructions, Mrs. Osborn met with her daughter's English teacher and the department chair. She repeated her and her husband's instructions: Refer to their daughter only as a girl, by her given name or a nickname based on it, and by female pronouns. And Mrs. Osborn also gave those instructions to her daughter's school counselor.

5.    Again, she and her husband thought that this was the end of the matter. But at the beginning of their daughter's junior year, the Osborns again discovered schoolwork showing that additional HISD employees were referring to their daughter by a masculine name.

6.    For at least two school years, pursuant to the policy, over half a dozen HISD employees referred to the Osborns' daughter as a boy without their notice or consent—in fact, notwithstanding their express objection. Faced with such a widespread practice of contravening their instructions about their own daughter, the Osborns approached Bellaire's principal about the situation. Yet he refused to direct his subordinates to comply with the Osborns' instructions. And when they asked for documents to help them understand how widespread that practice was, the principal provided little information.

7.    Lacking any assurance that HISD would follow their instructions to treat their daughter as a girl, the Osborns wrote, through counsel, a letter to HISD's board, its superintendent, and its counsel. That letter requested documents related to HISD's policy or practice of treating minors like their daughter as the opposite sex behind parents' backs. It also requested an assurance that HISD's actions would stop.

8.    In response, HISD provided neither. It confirmed that its employees treated the Osborns' daughter as a boy pursuant to HISD policy. But it produced no

documents. And it wholly ignored the Osborns' request for an assurance that HISD would stop treating their daughter as a boy.

9.      Now, the Osborns ask this Court for relief. HISD has a widespread practice and official policy of treating students, including the Osborns' daughter, as the opposite sex without parental notice or consent; against their express instructions; and while actively concealing that treatment from parents. That practice or policy violates the Osborns' fundamental parental rights guaranteed by the Fourteenth Amendment. Additionally, because it burdens their sincerely held religious beliefs and is not neutral or generally applicable, it also violates their First Amendment, free-exercise rights. And based on the actions the individual defendants have taken regarding the Osborns' daughter, they each face individual liability for the same constitutional violations as HISD.

10.      The Osborns want to help their daughter in the way they think best. But the actions of HISD and its employees are preventing them from doing that. And HISD's responses to the Osborns make clear that those actions will continue— unless this Court says enough is enough.

## PARTIES

11.      Plaintiffs Sarah and Terry Osborn are the married, biological parents of their minor daughter, to whom this complaint refers pseudonymously as "Jane Doe."

12.      The Osborns and Jane live in Houston, Texas.

13.      Mr. Osborn is an engineer, and Mrs. Osborn is a veterinarian.

14.      Defendant Houston Independent School District ("HISD") is an independent school district organized according to the provisions of Texas Law. *See* Tex.

Educ. Code § 11.011 *et seq.*; HISD Policy AA (Local) – *District Legal Status* (issued May 1, 2000).[1]

15.     Under Texas law, as an independent school district, HISD is a local public corporation that can sue or be sued. Tex. Educ. Code § 11.151(a); *Springboards to Educ., Inc. v. McAllen Indep. Sch. Dist.*, 62 F.4th 174, 182 (5th Cir. 2023).

16.     HISD is a political subdivision of the State of Texas. *See Lucenio v. Houston Indep. Sch. Dist.*, No. 4:21-cv-00650, 2022 WL 658838, at *3–4 (S.D. Tex. Feb. 16, 2022).

17.     According to its website, HISD is the largest school district in Texas and operates 274 schools, including Bellaire High School, where Jane attends.[2]

18.     Defendant F. Mike Miles, sued in his individual and official capacities, is the superintendent of schools at HISD, responsible for HISD's personnel decisions. *See* HISD Policy BJA (Local) – *Superintendent: Qualifications and Duties* (issued June 17, 2021).[3]

19.     Defendant Michael Niggli, sued in his individual and official capacities, is the principal of Bellaire High School, responsible for maintaining good student, teacher, and parent relations, as well as being the custodian of school records. *See* HISD Policy DP3 (Regulation) – *Personnel Positions* (issued December 14, 2009).[4]

20.     All HISD employees at Bellaire High School are accountable to Mr. Niggli. *See* HISD Policy DP (Local) – *Personnel Positions* (issued Sept. 5, 2023).[5]

---

[1] https://perma.cc/V8DX-7FUL

[2] https://perma.cc/D63N-46RN

[3] https://perma.cc/P27Z-MY8T

[4] https://perma.cc/HJH3-T3K6

[5] https://perma.cc/4747-WJ5S

21. Defendant Sarah Ray, sued in her individual and official capacities, is a counselor at Bellaire High School and has served as the primary liaison between Principal Niggli and Jane's teachers.

22. In this complaint, Mr. Miles, Mr. Niggli, and Ms. Ray are collectively referred to as the Individual Defendants.

23. The Osborns live within the geographic boundaries served by HISD's schools.

24. For the 2024–2025 school year, Jane was enrolled in the eleventh grade at Bellaire High School.

25. The Osborns intend to re-enroll Jane at Bellaire for the 2025–2026 school year.

26. Pursuant to its policy and practice and acting through the Individual Defendants and other employees, HISD has treated Jane as a boy without first notifying the Osborns or seeking their consent and hidden its treatment of Jane as a boy from the Osborns.

27. When they discovered HISD's treatment of Jane, the Osborns have repeatedly and consistently instructed HISD to stop treating Jane as a boy.

28. Each time the Osborns instructed HISD to stop treating Jane as a boy, its employees initially agreed to follow the Osborns' instructions.

29. But then HISD continued to treat Jane as a boy without notifying the Osborns or seeking their consent, and while actively concealing its treatment from—indeed, now contrary to their expressed wishes.

30. When HISD employees, including Individual Defendants, failed to notify the Osborns or seek their consent, continued to treat Jane as a boy, and when they actively concealed their actions, they acted pursuant to HISD policy, practice, usage, and custom.

## JURISDICTION AND VENUE

31.    This civil-rights action raises federal questions under the First and Fourteenth Amendments to the U.S. Constitution and the Civil Rights Act of 1871, 42 U.S.C. § 1983.

32.    This Court has original subject-matter jurisdiction over this action. 28 U.S.C. §§ 1331, 1343.

33.    Venue is proper in this District and Division, because the parties reside in this Division, 28 U.S.C. § 1391(b)(1), (c)(2); and because the events giving rise to the Osborns' claims occurred within this Division, *id.* § 1391(b)(2). *See* 28 U.S.C. § 124(b)(2) (establishing this Division's boundaries).

34.    Those same facts grant this Court personal jurisdiction over Defendants. *See Submersible Sys., Inc. v. Perforadora Cent., S.A. de C.V.*, 249 F.3d 413, 418 (5th Cir. 2001).

35.    This Court has authority to award declaratory relief, 28 U.S.C. §§ 2201–02; *see* Fed. R. Civ. P. 57; injunctive relief, 28 U.S.C. § 1343; *see* Fed. R. Civ. P. 65; nominal, compensatory,[6] and punitive damages, 28 U.S.C. § 1343; and costs and attorneys' fees, 42 U.S.C. § 1988; *see* Fed. R. Civ. P. 54.

## FACTUAL BACKGROUND

### I.    The Osborns discover an HISD form asking for pronouns on the first day of ninth grade.

36.    The Osborns' daughter, Jane, started the ninth grade at Bellaire High School in August 2022 as a 14-year-old.

37.    On the first day of ninth grade, Jane brought home a form from her theater teacher, Allison Underhill.

38.    That form sought various pieces of information about Jane, including a question that asked what pronouns to use for Jane.

---

[6] The only Defendant from whom compensatory damages are sought is HISD.

39.     With Jane, Mrs. Osborn completed the question about pronouns and several other questions on the form.

40.     In completing the question about pronouns, Mrs. Osborn instructed Ms. Underhill to refer to Jane as a girl by using female pronouns, specifically "she" and "her."

41.     Mrs. Osborn then gave the form to Jane to finish and return to Ms. Underhill.

42.     The next day before school, Mrs. Osborn discovered that Jane had whited out the answer to the pronoun question and written "he/him" as her pronouns.

43.     Mrs. Osborn told her daughter to change them back to female pronouns before submitting the form to Ms. Underhill.

44.     In September 2022, at a school open house, the Osborns met with Ms. Underhill.

45.     The Osborns told Ms. Underhill that they had seen the form and instructed her that, because Jane is female, she should refer to Jane with her given name and female pronouns.

46.     The Osborns also told Ms. Underhill that they would escalate the matter if their directions were not followed.

47.     Ms. Underhill seemed surprised by the mention of the form but assured the Osborns that she understood and that she would comply with their directions.

48.     The Osborns understood from that meeting that Ms. Underhill would only use her given name and female pronouns to refer to Jane.

49.     But contrary to her assurances, the Osborns later discovered that after the meeting, Ms. Underhill continued to use a masculine name and male pronouns to refer to Jane without telling the Osborns or seeking their consent.

7

50.     Such actions were taken pursuant to HISD policy and practice.

## II.    The Osborns discover HISD using a masculine name and male pronouns to refer to their daughter and instruct it to stop.

51.     In December 2023, when Jane was a 15-year-old tenth grader, the Osborns discovered schoolwork from several classes referring to Jane by a masculine name.

52.     From these worksheets, the Osborns learned that at least four teachers in different classes had been using the masculine name and male pronouns to refer to Jane, despite the Osborns' express instructions not to do that.

53.     On one of the worksheets, the teacher had crossed Jane's name out in red ink and written the masculine name next to it.

54.     These actions were taken pursuant to HISD policy and practice.

55.     Those four teachers were Ms. Underhill; Brian Wolf (Jane's English teacher); Robert Morales (Jane's chemistry teacher); and Alan Heise (Jane's world history teacher).

56.     Upon learning that HISD employees had continued to treat Jane as a boy contrary to her and her husband's instructions, Mrs. Osborn contacted two of these teachers, Mr. Wolf and Mr. Heise, to reiterate the Osborns' instruction to stop and to refer to Jane only by her given name[7] and female pronouns.

57.     The Osborns did not contact Ms. Underhill, because they had already instructed her not to use a masculine name and male pronouns for Jane—an instruction with which Ms. Underhill was not complying.

58.     At Jane's request, the Osborns did not contact Mr. Morales, because she told them she would discuss the issue with him.

59.     On December 18, 2023, Mrs. Osborn met with Mr. Wolf in person.

---

[7] The Osborns were also consistently comfortable with HISD employees using a shortened, nickname version of her given name.

60. During that meeting, she told him that she and her husband had discovered that he was referring to Jane by a masculine name and male pronouns.

61. Mrs. Osborn also told Mr. Wolf that his actions were contrary to the religious beliefs of her and Mr. Osborn, and that they believed Mr. Wolf's actions were harmful to their daughter.

62. Mrs. Osborn instructed Mr. Wolf to refer to Jane only by her given name and female pronouns.

63. Mr. Wolf did not agree to comply with Mrs. Osborn's instruction.

64. Instead, Mr. Wolf brought the English department chair, Elizabeth Chapman, into the meeting.

65. Mrs. Osborn reiterated her concerns and instructions to both Mr. Wolf and Ms. Chapman.

66. Mrs. Osborn stated her willingness to escalate the issue if they did not follow the Osborns' instructions regarding Jane.

67. Both Mr. Wolf and Ms. Chapman assured Mrs. Osborn that they would comply with her and Mr. Osborn's instructions regarding Jane.

68. Later that evening, Mrs. Osborn also emailed Mr. Heise instructing him to refer to Jane only by her given name and biological sex and to let her know if he wanted to discuss the instruction further.

## III. The Osborns reiterate their instructions that HISD refer to their daughter as a girl.

69. In January 2024, the Osborns arranged for Jane to begin visiting a therapist to support her through her discomfort with her sex.

70. The Osborns intentionally chose to work with a therapist who focused on possible root causes of the gender discomfort rather than one who would endorse or encourage the use of a masculine name and male pronouns.

71.    Sometime around February 2024, Mrs. Osborn met with Jane's guid-ance counselor, Sarah Ray, to discuss an assessment to see whether Jane needed any accommodations related to Attention-Deficit/Hyperactivity Disorder (ADHD).

72.    During the meeting, Ms. Ray mentioned that one of Jane's teachers had noted that Mrs. Osborn did not support Jane's use of different names and pro-nouns.

73.    In response, Mrs. Osborn made clear that the Osborns neither agreed with nor consented to any use of masculine names and male pronouns for Jane.

74.    Mrs. Osborn also told Ms. Ray that the Osborns wanted Jane to be re-ferred to only by her given name and female pronouns.

75.    Ms. Ray said that she would make note of Mrs. Osborn's comments.

76.    As a result of these discussions with Jane's teachers and guidance counselor, the Osborns believed that HISD employees would refer to Jane only by her given name and female pronouns going forward.

77.    On information and belief, despite the Osborns' instructions, HISD em-ployees continued to refer to Jane by the masculine name and male pronouns throughout her tenth-grade year pursuant to HISD policy and practice.

78.    In May 2024, HISD provided the Osborns with a report about Jane that contained information from her teachers relevant to assessing her for possible ADHD-related accommodations.

79.    In this report, Mr. Wolf avoided using a name or pronouns for Jane, re-ferring to her only as "the student":

> The student has outstanding analytical and creative abilities. The stu-dent generates high-level questions. The student excels in response to prompts that require synthesis evaluation, analysis, and critique. The student is well-organized and thorough and always completes assign-ments fully and on-time. The student has reported stress at home. Ms. Osborn has threatened litigation if not called by the student[']s chosen name. No interventions are needed.

80.    In the same report, although Ms. Underhill used Jane's correct name, she used the third-person plural pronoun "they" to refer to Jane:

> [Jane] is an asset to our theatre community. They are always enthusiastic, hardworking, and engaged. They are a leader and well respected by others in class. At times, [Jane] can get sidetracked, and may need instructions repeated, but the request is always completed. Interventions are clear expectations and directives.

81.    Like Ms. Underhill, Mr. Morales avoided the use of female pronouns to refer to Jane in the report:

> [Jane] is able to read and complete task[s] accurately and efficaciously. This extends to topics like Kinetics, Acids, and Bases. They take more time on average for quizzes and test[s]. More intensive calculations can be difficult.[8]

## IV.    After the Osborns discover that HISD is not complying with their instructions, they meet with the principal to ensure compliance.

82.    In August 2024, Jane, now sixteen, entered the eleventh grade at Bellaire High School.

83.    Shortly after the start of the school year, again the Osborns began to discover schoolwork from several classes that contained the same masculine name in reference to Jane, including pre-calculus (with Johnston French), English (with Jeffrey Walkington), and astronomy (with Reena Chopra).

84.    HISD employees' continued disregard for the Osborns' instructions led the Osborns to arrange a meeting with Bellaire's principal, Michael Niggli.

85.    To prepare for that meeting, the Osborns wrote a letter to Mr. Niggli on September 19 that detailed instances they knew about when HISD employees

---

[8] Many of the documents discussed in this complaint contain a large amount of sensitive personal information about the Osborns and Jane, in particular, including education and health information. To avoid the need to seek leave to file any documents under seal at this stage of this lawsuit, in most instances, relevant material from these sensitive documents has been excerpted in the complaint, and the entire document has not been attached as an exhibit. In some instances, a redacted version of the relevant document has been filed. Because the original versions of these documents are in Defendants' possession, custody, or control, there is no risk of prejudice to them posed by this.

had referred to Jane by a masculine name or male pronouns. *See* **Exhibit 1** (reproducing redacted copy of that letter).

86.     The Osborns also wrote in that letter about their clear instructions to those HISD employees to stop referring to Jane by a masculine name or male pronouns.

87.     Yet, as they further explained in their letter to Mr. Niggli, the Osborns continued to discover that HISD employees were using a masculine name and male pronouns to refer to their daughter—despite the employees' assurances that they would honor the Osborns' instructions.

88.     Finally, the Osborns explained in their letter to Mr. Niggli that their daughter's therapist had advised that HISD's continued treatment of Jane as a boy was "detrimental to her physical and emotional well-being" and was "negatively impacting her continuing care." *Id.*

89.     On September 23, 2024, the Osborns met with Mr. Niggli and Ms. Ray, who was Jane's school counselor.

90.     During that meeting, the Osborns reiterated their concerns about HISD's treatment of their daughter as a boy.

91.     They explained that HISD's treatment of their daughter as a boy conflicted with how they were raising her and burdened their faith.

92.     And they asked for assurances that HISD employees would only refer to their daughter by her given name and female pronouns.

93.     Mr. Niggli said that he would look into the situation further.

94.     In the meantime, he suggested that HISD and the Osborns should explore a "middle ground" solution around what name Jane would be called at school.

95.     Mr. Niggli's proposed "middle ground" was that employees refer to Jane only by her surname.

96.    But he did not commit to ensuring that HISD employees at Bellaire High School would stop referring to Jane as a boy.

97.    Nor did Mr. Niggli commit that he would ensure they would comply even with his "middle ground" proposal.

98.    In response, the Osborns repeated their instruction that HISD employees should refer to Jane only by her given name and female pronouns.

99.    Attendance at this meeting required the Osborns to travel to the school, which caused them to incur travel costs to and from the school, and lost income because of time off work.

100.    While the Osborns waited for a response from Mr. Niggli, they sent an additional email on September 27 to reiterate their instructions about how HISD employees must refer to Jane, which among other points stated:

> WE DEMAND IMMEDIATE NOTIFICATION if [our] child ever expresses a different pronoun, name preference or a different gender from her biological sex, or requests to be treated as any other identity that conflicts with her biological sex.
>
> …
>
> WE DO NOT CONSENT to any manner of [our] child socially transitioning at school. "Social transitioning" involves treating an individual as something other than her biological sex and includes things such as addressing that person by alternative names and/or pronouns not associated with her biological sex.

## V.    After the Osborns' meeting with the principal, HISD continues to disregard their instructions.

101.    Despite the Osborns' express instructions not to refer to Jane by a masculine name or male pronouns, HISD employees had continued to do so—without notifying the Osborns and certainly without their consent.

102.    So on October 20, 2024, the Osborns requested documents about HISD's treatment of their daughter from Mr. Niggli to understand how school employees had been treating Jane.

103.    The next day, Mr. Niggli responded to the Osborns to update them on his investigation.

104.    Although Mr. Niggli said he had placed in Jane's file the Osborns' September 27 email that expressly instructed HISD to stop treating their daughter as a boy, he refused to require HISD employees under his supervision to comply with the Osborns' instructions.

105.    Specifically, Mr. Niggli told the Osborns that "there will be no emails with directives to call [Jane] by any particular name."

106.    A week later, on October 28, Mr. Niggli emailed the Osborns that "Counselor Ray has communicated with teachers about your desires for [Jane] not be called [a masculine name]."

107.    But Mr. Niggli did not assure the Osborns that HISD employees would comply with their instructions.

108.    Because Mr. Niggli's responses did not state that HISD employees at Bellaire were complying with their instructions, they also requested that Mr. Niggli provide them with: a list of those who were referring to their daughter as a boy; and emails from HISD employees at Bellaire that referred to Jane by a masculine name or male pronouns.

109.    HISD did not provide the Osborns with such a list or any such emails.

110.    Mr. Niggli responded that he did not have a list of teachers who had been treating Jane as a boy and did not offer to create one.

111.    Similarly, he told the Osborns that he could not access other HISD employees' emails.

112.    But he did not explain why, as Bellaire's principal, he could not access his subordinates' emails.

14

113.    Mr. Niggli's response left the Osborns unable to obtain complete information, nor any assurances, about HISD's use of a masculine name and male pronouns to refer to their daughter.

114.    HISD employees continued to use the masculine name and male pronouns to refer to Jane after the Osborns' meeting with Mr. Niggli.

115.    Since then, the Osborns have informed HISD about its employees' continued use of the masculine name and male pronouns for Jane, and HISD's board has ratified those employees' actions as consistent with HISD policy.

## VI.    The Osborns seek to understand how HISD has been treating their daughter by submitting Public Information Act requests.

116.    Because Mr. Niggli did not provide the Osborns with information about which HISD employees had treated their daughter as a boy or assure them that those employees would now comply with the Osborns' instructions, they remained in the dark about how HISD employees had been treating Jane and would treat her going forward.

117.    As a result, the Osborns submitted a Public Information Act request and received three responsive documents from HISD.

118.    One of those documents, an email dated September 27, 2024, revealed that at least some HISD employees continued to call Jane the masculine name even after the Osborns met with Mr. Niggli and Ms. Ray first informed HISD employees of the Osborns' instructions to stop.

119.    Because HISD still had not provided the Osborns with any documents related to Jane's interactions with school counselors, they submitted a second Public Information Act request.

120.    After initially claiming that the Osborns' second request resulted in over 18,000 search results, HISD later said it had found no responsive documents and closed the request.

121.    HISD never explained the discrepancy between the 18,000 documents it had initially identified and its ultimate decision to produce nothing.

122.    Neither Mr. Niggli nor any HISD employee ever assured the Osborns that HISD employees would comply with their instruction to refer to Jane only by her given name and female pronouns.

123.    This lack of assurance from HISD concerned the Osborns.

124.    On February 13, 2025, a community member spoke on behalf of the Osborns at an HISD board meeting.

125.    At the HISD board meeting, without disclosing the Osborns' names, that community member told the HISD board that a girl was being treated as a boy at Bellaire High School without her parents' consent.

126.    HISD's board did not repudiate Bellaire's actions, nor did it instruct school officials to cease doing so, nor did it change HISD policy.

## VII.    In letters to the Osborns, HISD ratifies employees' treatment of their daughter as a boy.

127.    On March 17, 2025, the Osborns, through counsel, wrote a letter to HISD, copying Superintendent F. Mike Miles and all HISD board members. *See* **Exhibit 2** (reproducing redacted copy of that letter).

128.    That letter first detailed HISD's widespread practice of referring to the Osborns' daughter by a masculine name and male pronouns without their knowledge or consent, against their express objections, and while actively concealing that practice.

129.    They then asked HISD to assure the Osborns that its employees would comply with their instructions about their own daughter. *Id.* **2** at 3.

130.    The letter also sought several categories of documents from HISD by Public Information Act request.

131.    On March 24, only days after the letter was sent, the Osborns discovered yet more schoolwork that referred to Jane with the masculine name, which confirmed the Osborns' suspicions that HISD employees continued to ignore their instructions.

132.    On March 31, HISD responded to the Osborns' letter with a "[r]equest for clarification and narrowing" of the categories of documents they had requested. *See* **Exhibit 3** (reproducing redacted copy of that letter).

133.    HISD did not provide any documents responsive to the request.

134.    And HISD did not assure the Osborns that its employees would comply with their instructions about Jane's name and pronouns.

135.    In fact, HISD ignored their request for that assurance.

136.    On May 16, the Osborns again sought an assurance that HISD employees would refer to their daughter only by her given name and female pronouns. *See* **Exhibit 4** (reproducing redacted copy of that letter).

137.    The May 16 letter asked that HISD clarify its "position on its employees' repeated practice of socially transitioning [the Osborns'] daughter without their knowledge or consent—and even over their express objection." *Id.* at 2.

138.    Without such clarification, "the only conclusion is that HISD employees' pattern of cutting [the Osborns] out of decisions about their own daughter is consistent with HISD policy." *Id.*

139.    Responding on May 30, HISD again refused to assure the Osborns that it would stop treating their daughter as a boy. *See* **Exhibit 5** (reproducing redacted copy of that letter).

140.    Nor did it respond to the conclusion that HISD employees acted in accordance with HISD policy when they treated Jane as a boy without notifying the Osborns and seeking their consent, while actively concealing that treatment from the Osborns, and against the Osborns' express wishes.

141.    Again, HISD's May 30 letter ignored the Osborns' request that HISD comply with their instructions about their own daughter.

142.    HISD's exchange of letters with the Osborns demonstrates its and its board's knowledge of the widespread past and ongoing treatment of their daughter as a boy by its employees without the Osborns' consent to that treatment, without notifying them of it, while actively concealing it, and against their express objections to it.

143.    As a result, HISD and its board have ratified those employees' actions.

## VIII.  When HISD employees violated the Osborns' constitutional rights, they acted pursuant to HISD policy, practice, usage, and custom.

144.    In treating Jane as a boy without the Osborns' knowledge or consent, against their express objections, and while actively concealing that treatment, HISD employees acted pursuant to HISD's policies, practices, usages, and customs.

145.    HISD's policy, practice, usage, and custom is to refer to students by names and pronouns associated with the opposite sex on request of the student without parental notice or consent, while actively concealing these actions from parents, and even over express parental objections.

146.    The Osborns requested from HISD "[d]ocuments relating to HISD employees' gender-identity-related use of preferred or chosen names or pronouns for students, including policy, practice, or guidance documents, or training presentations and associated documents." **Exhibit 2** at 3.

147.    HISD responded: "[Y]ou can review all HISD policies related to nondiscrimination at: https://pol.tasb.org/PolicyOnline?key=592." **Exhibit 5** at 2.

148.    The policies cited by HISD include one that prohibits HISD and its employees from "treating a student or group of students differently from similarly situated students on the basis of … gender identity and/or gender expression." HISD

Policy FFH (Local) – *Student Welfare: Freedom from Discrimination, Harassment, and Retaliation* (issued Feb. 1, 2023).[9]

149.    HISD treated the Osborns' daughter as a boy without their notice and consent, while actively concealing it and over their express objection, pursuant to Policy FFH (Local) and HISD's other nondiscrimination policies.

150.    Citing those policies in a letter to the Osborns demonstrates that HISD and its board knew that HISD employees treated the Osborns' daughter as a boy without their notice and consent, while actively concealing it and over their express objection, pursuant to those policies.

151.    Additionally, HISD treated the Osborns' daughter as a boy without their notice and consent, while actively concealing it and over their express objection, pursuant to a widespread practice that is so common and well-settled that it amounts to a custom that fairly represents HISD policy.

152.    During the 2022–2023, 2023–2024, and 2024–2025 school years, multiple HISD employees treated the Osborns' daughter as a boy without their knowledge or consent, while actively concealing it and even over the Osborns' express objection pursuant to such policy and practice.

153.    For example, in September 2022, the Osborns instructed Ms. Underhill, who was their daughter's theater teacher, to refer to her only by female pronouns and her given name.

154.    Despite Ms. Underhill's assurance that she would follow the Osborns' instructions, in December 2023, they discovered schoolwork indicating Ms. Underhill had been referring to their daughter by a masculine name and male pronouns.

---

[9] https://perma.cc/DVJ5-2UMX

155.   Also in December 2023, the Osborns discovered schoolwork indicating that three other teachers had been referring to their daughter by a masculine name and male pronouns without notifying them or seeking their consent: Mr. Wolf, Jane's English teacher; Mr. Morales, her chemistry teacher; and Mr. Heise, her history teacher.

156.   The Osborns then instructed Mr. Wolf and Mr. Heise to refer to their daughter only by her given name and female pronouns.

157.   The Osborns also communicated that instruction to Ms. Ray, who was Jane's school counselor.

158.   Ms. Ray agreed to make note of that instruction.

159.   Despite the Osborns' instructions, Ms. Underhill, Mr. Wolf, and Mr. Morales continued avoiding the use of female pronouns to refer to Jane.

160.   Even after the Osborns communicated their instructions to Jane's teachers and her school counselor, in August 2024, they once again discovered schoolwork indicating that teachers were using a masculine name to refer to Jane.

161.   Those teachers included Mr. French, her pre-calculus teacher, Mr. Walkington, her English teacher, and Ms. Chopra, her astronomy teacher.

162.   Both at in-person meetings and by email, the Osborns then instructed Mr. Niggli, the school principal, that HISD and its employees should stop referring to Jane by a masculine name and male pronouns.

163.   Although Mr. Niggli told them Ms. Ray had informed teachers about the Osborns' instructions, he also told them that "there will be no emails with directives to call [Jane] by any particular name."

164.   And HISD documents reveal that, around that same time, at least some of Jane's teachers continued to refer to her by a masculine name.

165.   The Osborns then wrote letters to HISD, copying Superintendent Miles, to instruct it to stop referring to Jane by masculine names and male

20

pronouns, and refer to her only by her given name and female pronouns. *See* **Exhibit 2** at 3; **Exhibit 4** at 2.

166.   In its response letters, HISD refused to acknowledge the Osborns' instruction.

167.   Not only that, even after sending those letters, the Osborns continued to discover schoolwork referring to Jane by a masculine name.

168.   HISD's widespread practice of treating students as the opposite sex without parental notice or consent, while actively concealing it and even over express parental objections, has been in effect since at least August 2022 and continues today.

169.   HISD and its board have actual and constructive knowledge of both the policy and widespread practice, among other reasons, because a community member informed HISD and the board of it during a February 2025 meeting and because the Osborns informed HISD and the board of it in their 2025 letters.

170.   In addition to the policy, and since obtaining actual and constructive knowledge, HISD and its board have ratified that widespread practice.

171.   Through communications with the Osborns, Mr. Miles, Mr. Niggli, and Ms. Ray have knowledge of HISD's widespread practice and official policy of treating the Osborns' daughter as a boy without their notice and consent, while actively concealing it and over their express objection.

172.   Yet all three Individual Defendants have continued to participate in, and refused to prevent other HISD employees from participating in, that practice and policy.

## IX.   HISD attempted to "socially transition" the Osborns' daughter without their knowledge or consent.

173.   By using a masculine name and incorrect pronouns for Jane, HISD and its employees engaged in a psychosocial intervention for gender dysphoria

sometimes called "social transition." *See Mirabelli v. Olson*, 691 F. Supp. 3d 1197, 1207–09 (S.D. Cal. 2023) (describing nature of social transition and summarizing evidence supporting cautious approach to it, particularly without parental involvement).

174.    Gender dysphoria is a health diagnosis defined in the DSM-5, requiring multiple criteria for adolescents including clinically significant distress and other "strong" symptoms sustained for at least six months.[10]

175.    Diagnosis is complex, and children or adolescents presenting for diagnosis very commonly suffer from other clinical mental health conditions, such as anxiety, depression, and borderline personality disorder, which may lead to misdiagnosis.[11]

176.    Professional organizations generally agree that a thorough psychiatric evaluation by a qualified mental health professional is essential for accurate diagnosis.[12]

177.    Professional organizations also generally agree that other mental health conditions should be addressed before any decision is made about transition.[13]

178.    Gender dysphoria has historically been a very rare phenomenon, impacting almost exclusively small numbers of prepubertal boys and adult men.[14]

---

[10] Am. Psychiatric Ass'n, *Diagnostic and Statistical Manual of Mental Disorders* 452–53 (5th ed. 2013).

[11] Hembree et al., *Endocrine Treatment of Gender-Dysphoric/Gender-Incongruent Persons: An Endocrine Society Clinical Practice Guideline*, J. of Clinical Endocrinology & Metabolism (2017) 102(11), at 3876; Levine et al., *Reconsideration of Informed Consent for Transidentified Children, Adolescents, and Young Adults*, J. Sex & Marital Therapy (2022) at 3, 5.

[12] Hembree et al., (2017) at 3876.

[13] *Id.*

[14] Zucker, *Adolescents with Gender Dysphoria: Reflections on Some Contemporary Clinical and Research Issues*, Archives of Sexual Behavior (2019) at 1–2.

179.    In recent years, a very different phenomenon has exploded, with very large numbers of adolescents—the majority girls—asserting that they suffer from gender dysphoria, which is referred to as "adolescent onset" or "rapid onset" gender dysphoria.[15]

180.    The cause of this new trend is unknown. Many experts believe that social influences including social media and peer group pressure are playing an important role in leading girls to identify as the opposite sex.[16]

181.    Increasing numbers of young women who were transitioned during adolescence are now regretting those decisions, detransitioning (that is, identifying as female once again), and speaking out to say that they were misled, misdiagnosed, and harmed by those adults who encouraged and assisted them to identify as male.[17]

182.    School staff are not qualified to diagnose gender dysphoria.

183.    There is no agreed "standard of care" for treating prepubertal children or adolescents who suffer from gender dysphoria, and there is large disagreement among doctors and mental health professionals in the United States and Europe on this question.[18]

184.    Children who struggle with gender dysphoria often seek professional intervention, including assistance with social transition, which typically includes changes in the use of names and pronouns.[19]

---

[15] Littman, *Parent reports of adolescents and young adults perceived to show signs of a rapid onset of gender dysphoria*, PLoS ONE, 13(8) e0202330 (2018) at 3–5.

[16] *Id.*; Selin Davis, *A Trans Pioneer Explains Her Resignation from the US Professional Association for Transgender Health,* Quillette (Jan. 6, 2022), https://quillette.com/2022/01/06/a-transgender-pioneer-explains-why-she-stepped-down-from-uspath-and-wpath/.

[17] *See generally* Littman, *Individuals Treated for Gender Dysphoria with Medical and/or Surgical Transition Who Subsequently Detransitioned: A Survey of 100 Detransitioners*, Archives of Sexual Behavior (2021).

[18] Levine & Abbruzzese, *Current Concerns About Gender-Affirming Therapy in Adolescents*, Current Sexual Health Reports (2023) at 6.

[19] Zucker, *Different strokes for different folks*, Child & Adolescent Mental Health, (2020) 25(1), at 1.

185.    Absent parental consent, school staff are not authorized to treat either gender dysphoria or comorbid mental health conditions in children.

186.    Indeed, school staff are not authorized to provide even the most basic healthcare, such as providing aspirin to children, without express parental consent.

187.    The involvement of parents is essential for obtaining a thorough psychiatric evaluation of a child, obtaining and supporting treatment of potential preexisting mental health conditions, and treating gender dysphoria.[20]

188.    Leading a child or adolescent to conceal important life changes from his or her parents, and to lead a "double life" presenting different identities at home and at school, imposes a serious risk of worsening the mental health of the child, as occurred here.[21]

189.    No medical organization recommends subjecting children or adolescents to social transition without the knowledge of their parents.

190.    All studies that have claimed to show any improvement in mental health following social transition suffer severe methodological defects, as acknowledged by a recent systematic review of the evidence commissioned as part of the English "Cass Review"—the most comprehensive assessment of the evidence for treatment of gender dysphoria to date.[22]

---

[20] World Prof'l Ass'n for Transgender Health, *Standards of Care for the Health of Transgender and Gender Diverse People* (Version 8) at S58, https://www.tandfonline.com/doi/pdf/10.1080/26895269.2022.2100644.S58.

[21] Selin Davis, *A Trans Pioneer Explains Her Resignation from the US Professional Association for Transgender Health*, Quillette (Jan. 6, 2022), https://quillette.com/2022/01/06/a-transgender-pioneer-explains-why-she-stepped-down-from-uspath-and-wpath/.

[22] Hall et al., (2024). *Impact of social transition in relation to gender for children and adolescents: a systematic review,* Archives of Disease in Childhood (2024) at 6.

191.    The 2025 evidence review commissioned by the U.S. Department of Health and Human Services similarly noted that the certainty of both benefits and harms of social transition was "very low."[23]

192.    A recent study examining data from the Tavistock clinic in the United Kingdom found that social transition was not associated with an improvement in mental health.[24]

193.    There is no evidence that social transition is lifesaving. While adolescents who suffer from gender dysphoria also suffer from a range of other serious mental health conditions and high rates of suicidal thoughts, no study has found that any form of transition—whether social or medical—reduces the rate of suicide in these young people.[25]

194.    It is well known that among prepubertal children who suffer gender dysphoria, the vast majority will desist from suffering dysphoria and become comfortable with their biological sex by adulthood *but only if they do not socially transition*.[26]

195.    Experts who disagree on many things agree that social transition is a powerful psychosocial intervention that greatly reduces the chances that the young person will cease experiencing gender dysphoria and become comfortable with his or her biological sex.[27]

---

[23] U.S. Department of Health and Human Services, *Treatment for pediatric gender dysphoria: Review of evidence and best practices,* (2025) at 89, https://opa.hhs.gov/sites/default/files/2025-05/gender-dysphoria-report.pdf

[24] Morandini et al., *Is Social Gender Transition Associated with Mental Health Status in Children and Adolescents with Gender Dysphoria?*, Archives of sexual behavior (2023) 52(3), 1045–1060.

[25] Levine (2023) at 3–4.

[26] Zucker, *The Myth of Persistence: Response to "A Critical Commentary on Follow-Up Studies & 'Desistance' Theories about Transgender & Gender Non-Conforming Children" by Temple Newhook et al.*, 19:2 Int'l J. of Transgenderism (2018) 231, at 7.

[27] Zucker (2020) at 2; Hembree et al. (2017) at 3879.

196.    In other words, some evidence shows that social transition "locks" the child into discomfort with his or her biological sex (that is, entrenches rather than cures gender dysphoria), and greatly increases the likelihood that the child will continue on to puberty blockers, cross-sex hormones, or both.[28]

197.    As a result, social transition puts the child on a difficult-to-escape pathway to medicalized transition that will expose the young person to risks of serious harms that are either known to exist or are well recognized as potential risks but have not been meaningfully studied. These risks of harm include lifelong sterility, failure to develop and be able to enjoy healthy sexual responses and relationships, impaired brain development, weakened bones, increased risk of cardiovascular illness, broken family relationships and social isolation in adult life, dependence on regular hormone shots, and more.[29]

198.    Instead of benefits, studies that have tracked individuals into life after transition—life a decade or more later—have found strikingly high rates of mental illness, suicide, and mortality from a variety of causes.[30]

199.    HISD's policy, practice, usage, or custom, and its application of that to the Osborns and their daughter, here contravene the evidence showing the need to include parents when adolescents are struggling with discomfort with their sex—regardless of whether or not that discomfort rises to a level that would meet a formal diagnosis of gender dysphoria.

---

[28] DHHS (2025) at 84; Cass, *Independent review of gender identity services for children and young people: Final report* (2024) at 31, 163–64, https://cass.independent-review.uk/home/publications/final-report/.

[29] Cass (2022) at 36–38; Cass (2024) at 196; Baxendale, *The impact of suppressing puberty on neuropsychological function: A review*, Acta Pediatrica (2024) 113, 1156–1167; Levine, *Informed Consent for Transgendered Patients*, J. Sex & Marital Therapy (2018) at 5–9.

[30] DHHS (2025) at 124; Levine (2023) at 1; Glintborg et al., *Gender-affirming treatment and mental health diagnoses in Danish transgender persons: a nationwide register-based cohort study,* European J. of Endocrinology (2023) 189, at 342–43.

200.   By using a masculine name and male pronouns for Jane, HISD provided psychological treatment to Jane to address her discomfort with her sex.

201.   By using a masculine name and male pronouns for Jane, HISD was engaging in and continues to engage in a psychosocial intervention that increases the odds that Jane will continue to struggle with discomfort with her sex.

202.   The Osborns continue to engage a therapist to support Jane in working through her discomfort with her sex.

203.   By engaging in a psychosocial intervention for Jane, HISD has prolonged the need for a therapist for Jane.

204.   These visits with therapists have caused the Osborns to incur costs, including therapists' fees and travel costs to and from appointments.

## X.   HISD's actions violated the Osborns' sincerely held religious beliefs and their parental rights.

205.   The Osborns' Christian faith and religious beliefs are central to the way they live and raise their family.

206.   The Osborns' beliefs are founded on the Bible.

207.   The Osborns strive to live out their Christian faith daily by incorporating it into their whole lives, including their work, home, and family life.

208.   The Osborns are members of a nondenominational, evangelical church.

209.   They left their previous church after discovering that the church's teaching did not align with their own on matters of sexuality, including how to deal with children struggling with discomfort with their sex.

210.   The Osborns' religious beliefs shape and govern their views about human nature, childrearing, the parent-child relationship, sexuality, and gender identity, among other topics.

211.   The Osborns believe that God created the family and charged parents with the primary responsibility of raising, guiding, and caring for their children.

212.   The Osborns believe that parents and family play an essential role in maintaining a child's physical and mental health and well-being.

213.   The Osborns believe that they have a God-given responsibility to provide for and participate in all aspects of their children's upbringing and in a way that is consistent with their faith.

214.   This responsibility extends not just to spiritual growth and training, but also to the arenas of education and physical, mental, and emotional health.

215.   The Osborns' faith also teaches that God created two sexes, male and female, and that these two sexes are a core part of God's intended design for humanity.

216.   The Osborns believe that each of us is born with a fixed biological sex that is a gift from God, not an arbitrary imposition subject to change.

217.   The Osborns' sincerely held religious beliefs prevent them from personally affirming or communicating views about human nature and gender identity that are contrary to those beliefs.

218.   The Osborns also believe that referring to a child using pronouns that are inconsistent with the child's biological sex is harmful to the child because to do so communicates a message to and about the child that is untrue.

219.   The Osborns' faith also dictates the advice and guidance they believe they should provide to their children on any number of difficult or potentially life-altering decisions, in whatever arenas those difficulties or challenges may arise.

220.   The Osborns believe that, because of children's inexperience and immaturity, children often do not appreciate the long-term consequences of their actions and consequently need the advice and counsel of their parents to reach sound decisions.

221.   The Osborns believe they must protect their children from making life-changing decisions their children may later regret.

28

222.    The Osborns believe that children should not be encouraged to undertake "social transition," even if only using names and pronouns which reflect the opposite sex, because of the complexity of the issues involved and children's inability to thoroughly assess the long-term consequences of such actions.

223.    The Osborns will not encourage one of their children on a path that distances the child from her biological sex, including the use of names or pronouns inconsistent with the child's biological sex, which would communicate that the child's sex is subject to change.

224.    Instead, the Osborns believe that the best approach to resolve any discomfort with biological sex is to provide their child the noninvasive therapeutic support necessary to identify and address the underlying cause of the discomfort, while continually affirming: (a) that their child is "fearfully and wonderfully made," *Psalm* 139:14; (b) that God's "steadfast love" for their child "never ceases; his mercies never come to an end," *Lamentations* 3:22; and (c) that they seek to mirror God's own love for their children, *see Psalm* 103:13.

225.    As parents, the Osborns believe they are called to walk with their children through any struggles, reminding their children that they are loved.

226.    Regardless of their children's feelings, beliefs, or actions about their sex or gender, the Osborns will never stop loving their children, nor love them any less.

## CAUSES OF ACTION

227.    All HISD policies, practices, customs, and usages alleged in this complaint and actions attributed to Defendants were undertaken and maintained under color of law, and HISD and its board have actual and constructive knowledge of them.

228.    Pursuant to HISD policy, practices, customs, and usages, Defendants socially transitioned Jane without notifying the Osborns or seeking their consent and while concealing their actions from the Osborns—and continue to do so, even over the Osborns' express instructions.

229.    The policies, practices, customs, and usages that led Defendants to socially transition Jane without notifying the Osborns or seeking their consent, and while concealing their actions from and contravening the express instructions of the Osborns, remain in full force and effect.

230.    The actions Defendants took, and continue to take, to socially transition Jane without notifying the Osborns or seeking their consent, and while concealing their actions from and contravening the express instructions of the Osborns, are not narrowly tailored to a compelling governmental interest.

231.    The actions Defendants took, and continue to take, to socially transition Jane without notifying the Osborns or seeking their consent, and while concealing their actions from and contravening the express instructions of the Osborns, are not rationally related to a legitimate government purpose.

232.    By failing to grant any process to the Osborns before socially transitioning Jane, Defendants denied the Osborns due process of law.

233.    The Osborns have suffered irreparable harm because of Defendants' actions.

234.    Absent an injunction, the Osborns will continue to suffer irreparable harm for which they lack an adequate remedy at law.

235.    The threat of irreparable harm to the Osborns and Jane outweighs any alleged harm Defendants may claim an injunction would cause them.

236.    An injunction will not adversely affect the public interest.

237.    Defendants' actions caused the Osborns to suffer damages, including the cost of transportation to and from meetings with HISD employees, lost income due to attendance at those meetings, therapists' fees, and other damages.

### FIRST CAUSE OF ACTION
### Free Exercise of Religion
### (U.S. Const., amends. I, XIV; 42 U.S.C. § 1983)

238.    The Osborns repeat and reallege each of the allegations in paragraphs 1–237 of this Complaint.

239.    The First Amendment, incorporated against the States by the Fourteenth Amendment, bars state laws "prohibiting the free exercise [of religion]." U.S. Const., amend. I; *see id.*, amend. XIV.

240.    The Osborns' free-exercise rights include the right to raise their children in accordance with their religious beliefs and the right to direct their children's education and upbringing consistent with their religious beliefs, including on identity, sex, gender, and fundamental questions of existence like how their children should identify themselves. *E.g.*, *Espinoza v. Mont. Dep't of Revenue*, 140 S. Ct. 2246, 2261 (2020); *Emp. Div., Dep't of Hum. Res. v. Smith*, 494 U.S. 872, 881–82 (1990); *Parham v. J.R.*, 442 U.S. 584, 590 (1979); *Wisconsin v. Yoder*, 406 U.S. 205, 213–14 (1972); *Pierce v. Soc'y of Sisters*, 268 U.S. 510, 518 (1925).

241.    By referring to Jane with a masculine name and male pronouns without notifying the Osborns or seeking their consent and by concealing these actions from the Osborns, Defendants substantially burdened the Osborns' ability to exercise their religion.

242.    The Osborns were substantially burdened in the exercise of their religion because Defendants subjected their daughter to a social transition that directly violates their beliefs and concealed these actions from them.

243.   The Osborns were substantially burdened in the exercise of their religion because Defendants' concealment of its social transition of Jane interfered with their ability to instill their beliefs and counteract Defendants' message that people can change their sex.

244.   During the two-and-a-half-year period that Defendants were concealing from the Osborns the actions taken to socially transition Jane, the Osborns were unable to exercise their religion by choosing to educate Jane in an environment that would not have undermined their religious beliefs.

245.   The First Amendment bars application of even a neutral, generally applicable law to religiously motivated action when that action implicates parents' right to direct the upbringing and education of their children.

246.   Because Defendants have substantially burdened the Osborns' right to exercise their religion by directing their daughter's upbringing and education, Defendants' actions receive strict scrutiny.

247.   Defendants' actions also receive strict scrutiny because they force the Osborns to choose between receiving a government benefit (here, enrollment in public school) or exercising their free exercise right to direct their daughter's upbringing and education.

248.   And Defendants' actions receive strict scrutiny because they were neither neutral towards religion nor generally applicable.

249.   Defendants consider whether to notify parents of a social transition on a case-by-case basis.

250.   Applying that instruction to the Osborns required Defendants to take the Osborns' individualized circumstances into consideration when deciding whether to notify them that Defendants were referring to Jane by a masculine name and male pronouns.

251.    The discretionary nature of this inquiry renders Defendants' actions neither neutral nor generally applicable.

252.    Because Defendants' actions interfere with the Osborns' First Amendment right to direct their children's education and upbringing, and because those actions are neither neutral toward religion nor generally applicable, they receive strict scrutiny.

253.    Because the Osborns explicitly explained that their instructions were grounded in their religious beliefs, and Defendants ignored and flouted those instructions while at times feigning compliance, Defendants' actions are hostile towards religion and receive strict scrutiny.

254.    Defendants' actions burdening the Osborns' First Amendment rights fail strict scrutiny because they are not narrowly tailored to any compelling interest—indeed, not even rationally related to a legitimate interest.

255.    Defendants performed their actions burdening the Osborns' First Amendment rights pursuant to HISD policy, practice, custom, and usage.

256.    Defendants' actions, including those performed by HISD employees pursuant to HISD policy, practice, custom, and usage, are unlawful under the First and Fourteenth Amendments.

257.    In addition, Mr. Miles was aware of the unlawful actions of HISD employees by March 17, 2025, at the latest.

258.    As HISD's superintendent, Mr. Miles has the authority to instruct HISD employees, including the other Individual Defendants, to stop violating the Osborns' constitutional rights.

259.    Yet he failed to do so.

260.    By failing to prevent HISD employees under his supervision from committing unlawful actions of which he was aware, Mr. Miles acted with deliberate indifference to those employees' violations of the Osborns' constitutional rights.

261.    Mr. Niggli was aware of the unlawful actions of HISD employees at Bellaire High School by September 23, 2024, at the latest.

262.    As the principal of Bellaire High School, Mr. Niggli has the authority to instruct HISD employees at that school to stop violating the Osborns' constitutional rights.

263.    Yet he failed to do so.

264.    By failing to prevent HISD employees under his supervision from committing unlawful actions of which he was aware, Mr. Niggli acted with deliberate indifference to those employees' violations of the Osborns' constitutional rights.

265.    Additionally, Mr. Niggli, Ms. Ray, and other HISD employees socially transitioned Jane without notifying the Osborns or seeking their consent—even after they expressly objected to this social transition.

266.    Even after Mr. Niggli and Ms. Ray became aware of the Osborns' objections, they actively concealed the social transition from the Osborns by telling them their objections had been communicated to HISD employees at Bellaire, while HISD employees continued to socially transition Jane.

267.    Individual Defendants did not make any split-second decisions regarding HISD's social transition of Jane but instead had time to plan their decisions, investigate all the relevant facts, and consult with counsel.

268.    Defendants ratified the acts of Individual Defendants, and HISD employees under their supervision, when they did nothing after being notified of their actions.

269.    Defendants also acted with deliberate indifference to the known or obvious fact that constitutional violations would result from HISD policy, practice, custom, and usage.

270.    Additionally, HISD policy, practice, custom, and usage, along with their application to the Osborns, violated and continue to violate the Constitution.

34

271.    By violating the Osborns' free-exercise rights protected by the First Amendment, Defendants have irreparably harmed the Osborns and, absent an injunction, will continue to irreparably harm the Osborns.

272.    An injunction preventing Defendants from further constitutional violations would not harm them and would be in the public interest.

273.    Defendants' violation of the Osborns' First Amendment rights has caused them to suffer damages, including the cost of transportation to meetings with HISD employees, lost income due to attendance at those meetings, and other damages.

274.    As Defendants acted with reckless and callous indifference to the Osborns' constitutional rights, punitive damages are warranted.

## SECOND CAUSE OF ACTION
### Fundamental Right to Direct Child's Upbringing, Education, and Healthcare
### (U.S. Const., amend. XIV; 42 U.S.C. § 1983)

275.    The Osborns repeat and reallege each of the allegations contained in paragraphs 1–237 of this Complaint.

276.    The Fourteenth Amendment prohibits the States from "mak[ing] or enforc[ing] any law which shall abridge the privileges or immunities of citizens of the United States," and from "depriv[ing] any person of life, liberty, or property, without due process of law." U.S. Const., amend. XIV, § 1.

277.    This Amendment "provides heightened protection against government interference with certain fundamental rights and liberty interests." *Washington v. Glucksberg*, 521 U.S. 702, 720 (1997).

278.    Among the fundamental rights and liberty interests the Constitution protects is "the [liberty] interest of parents in the care, custody, and control of their

children"—"perhaps the oldest of the fundamental liberty interests recognized" by the Court. *Troxel v. Granville*, 530 U.S. 57, 65 (2000) (plurality op.).

279.   This includes parents' fundamental rights to establish a home and bring up children, including by directing their children's upbringing, education, and healthcare.

280.   The fundamental right of parents to direct the upbringing, education, and healthcare of their children is "objectively, 'deeply rooted in this Nation's history and tradition.'" *Glucksberg*, 521 U.S. at 720–21 (citation omitted).

281.   Fundamental parental rights have deep common-law roots. *See, e.g.*, 1 William Blackstone, *Commentaries on the Laws of England* \*446–53 (10th ed. 1787) (describing the rights of parents at common law in England), http://bit.ly/3leX7za; 2 James Kent, *Commentaries on American Law* \*189–217 (10th ed. 1860) (same, in the United States), https://bit.ly/3ttTN79.

282.   Fundamental parental rights have long encompassed matters related to education that sweep beyond formal schooling, including parents' right to guide their children through difficult and potentially life-altering decisions, like how to address gender confusion or shape a child's core identity.

283.   Parents' fundamental right to guide their children's upbringing, education, and healthcare reaches its peak on matters of great importance.

284.   Questions about children's identity as male or female, what that identity means for their lives, and whether they can or should change that identity are important matters that fall within parents' right to counsel their children and direct their upbringing, education, and healthcare.

285.   Parental involvement is essential to adequately address the multifaceted nature of a child's discomfort with his or her sex.

286.   The Constitution requires courts to presume that parents will act in the best interests of their children.

287.   Cutting parents out of decisions concerning these important issues is inconsistent with that presumption and deprives parents of the ability to instill their beliefs and counter influences on their children that they find inimical to their religious beliefs or the values they wish to instill in their children.

288.   By referring to Jane with a masculine name and male pronouns without notifying the Osborns or seeking their consent and by concealing these actions from the Osborns, Defendants interfered with and denied the Osborns their fundamental right to direct the upbringing, education, and healthcare of their daughter about important topics like her identity as a young woman.

289.   By providing psychological treatment to Jane to address her discomfort with her sex through social transition, Defendants interfered with and denied the Osborns their fundamental right to direct the upbringing, education, and healthcare of their daughter by introducing a serious risk of worsening the mental health of their child and interfering with their chosen course of treatment.

290.   Defendants also interfered with and denied the Osborns their fundamental right to direct the upbringing, education, and healthcare of their daughter by preventing them from instilling their own beliefs and counteracting Defendants' messages about sex and gender and from counseling her about important decisions like whether she should socially transition at school, receive therapy related to gender confusion, or take some other course of action.

291.   During the approximately two-and-a-half years that Defendants were actively concealing from the Osborns their actions to socially transition Jane, Defendants interfered with the Osborns' fundamental right to direct the upbringing, education, and healthcare of Jane, because they lacked the knowledge necessary to exercise their right to choose to educate Jane in an environment that would not have undermined their religious beliefs.

292.   Defendants weren't merely aware of Jane's social transition; they actively participated in it as authority figures to Jane in direct contradiction with the Osborns' clear instructions.

293.   Defendants' continuous and repeated flouting of the Osborns' clear instructions exacerbates the interference with the Osborns' fundamental rights.

294.   Additionally, the Constitution generally requires parental consent to any decisions involving children's healthcare.

295.   Deciding how best to help a child struggling with discomfort with his or her sex is the sort of decision for which the Fourteenth Amendment requires parental consent.

296.   When referring to Jane by a masculine name and male pronouns, Defendants engaged in so-called "social transition," which is a psychotherapeutic intervention for gender dysphoria that scientific evidence demonstrates has a powerful psychological effect on the development and outcomes of a child.

297.   By socially transitioning Jane without notifying the Osborns or seeking their consent, Defendants denied the Osborns their fundamental right to direct their daughter's healthcare related to the important topic of discomfort with her sex.

298.   Additionally, because social transition makes it more likely that a child's discomfort with his or her sex will persist into adulthood, Defendants' actions burdened the Osborns' exercise of their right to direct Jane's healthcare.

299.   Strict scrutiny applies to Defendants' violation of the Osborns' fundamental right to direct the upbringing, education, and healthcare of their daughter.

300.   Defendants' actions violating the Osborns' fundamental rights are neither narrowly tailored to any compelling interest nor rationally related to a legitimate interest.

301.    Defendants performed their actions violating the Osborns' fundamental rights pursuant to a policy, practice, custom, and usage of HISD.

302.    The policy, practice, custom, and usage is legislative action by HISD, and this violation of the Osborns' rights results from the concerted action of multiple HISD employees pursuant to that policy, practice, custom, and usage.

303.    Defendants' actions, including those performed by HISD employees pursuant to HISD policy, practice, custom, and usage, are unlawful under the Fourteenth Amendment.

304.    As already alleged, *see supra* ¶¶ 254–260, Mr. Miles acted with deliberate indifference to HISD employees' violations of the Osborns' constitutional rights, because he knew about those violations, had the authority to stop them, and failed to do so.

305.    Similarly, as also alleged above, *see supra* ¶¶ 261–264, Mr. Niggli acted with deliberate indifference to HISD employees' violations of the Osborns' constitutional rights, because he knew about those violations, had the authority to stop them, and failed to do so.

306.    As further alleged above, *see supra* ¶¶ 265–266, Mr. Niggli, Ms. Ray, and other HISD employees socially transitioned Jane without notifying the Osborns, without seeking their consent, and against their express objections—all while actively concealing those actions from the Osborns.

307.    Individual Defendants did not make any split-second decisions regarding HISD's social transition of Jane but instead had time to plan their decisions, investigate all the relevant facts, and consult with counsel.

308.    Defendants ratified the acts of Individual Defendants, and HISD employees under their supervision, when they did nothing after being notified of their actions.

309.   Defendants also acted with deliberate indifference to the known or ob-vious fact that constitutional violations would result from HISD policy, practice, custom, and usage.

310.   Additionally, HISD policy, practice, custom, and usage, along with their application to the Osborns, violated and continue to violate the Constitution.

311.   Defendants' social transition of Jane is inconsistent with a historical and traditional understanding of the relationship between public schools and par-ents of students at those schools.

312.   By violating the Osborns' fundamental rights, Defendants have irrepa-rably harmed the Osborns and, absent an injunction, will continue to irreparably harm the Osborns.

313.   An injunction preventing Defendants from further constitutional viola-tions would not harm them and would be in the public interest.

314.   Defendants' violation of the Osborns' fundamental rights has caused them to suffer damages, including the cost of transportation to meetings with HISD employees, lost income due to attendance at those meetings, and other damages.

315.   As Defendants acted with reckless and callous indifference to the Os-borns' constitutional rights, punitive damages are warranted.

### THIRD CAUSE OF ACTION
### Deprivation of Liberty without Due Process
### (U.S. Const., amend. XIV; 42 U.S.C. § 1983)

316.   The Osborns repeat and reallege each of the allegations contained in paragraphs 1–237 of this Complaint.

317.   The U.S. Constitution provides that no State shall "deprive any person of life, liberty, or property, without due process of law." U.S. Const., amend. XIV, § 1.

318.    In general, procedural-due-process principles protect persons from deficient procedures that lead to the deprivation of cognizable liberty interests.

319.    To establish a procedural-due-process violation, the Osborns need to show that they have been deprived of a cognizable liberty interest, and that such deprivation occurred without adequate procedural protections. *James v. Cleveland Sch. Dist.*, 45 F.4th 860, 864 (5th Cir. 2022).

320.    The Osborns have a cognizable liberty interest in making decisions on behalf of their daughter.

321.    That liberty interest encompasses decisions about their daughter's education and healthcare, and thus an infringement of that interest can violate a parent's right to procedural due process.

322.    Parents' procedural-due-process rights are violated if parental consent or a court authorization is not obtained before government conduct that can cause physical or psychological injury to a child, unless the child is in imminent danger.

323.    Defendants deprived the Osborns of a cognizable liberty interest when they referred to Jane by a masculine name and male pronouns without notifying the Osborns or seeking their consent and when they concealed those actions.

324.    Those actions attempted to "socially transition" Jane, a psychotherapeutic intervention that has a powerful psychological effect on the development of an adolescent.

325.    Defendants' actions were sufficiently invasive to trigger procedural safeguards.

326.    But Defendants failed to give, or even attempt to give, notice to the Osborns of their intent to socially transition Jane.

327.    Defendants also deprived the Osborns of a hearing or an opportunity to object to Defendants' actions towards their daughter.

41

328.    Defendants did not provide the Osborns with *any* procedural protection whatsoever before depriving them of a cognizable liberty interest.

329.    Instead, Defendants took affirmative steps to deceive the Osborns about their actions to socially transition Jane, which removed any possibility of process before or during the deprivation of the Osborns' liberty interest.

330.    Defendants violated the Osborns' right to procedural due process.

331.    Defendants performed their actions violating the Osborns' procedural-due-process rights pursuant to a policy, practice, custom, and usage of HISD.

332.    Defendants' actions, including those performed by HISD employees pursuant to HISD policy, practice, custom, and usage, are unlawful under the Fourteenth Amendment.

333.    As already alleged, *see supra* ¶¶ 254–260, Mr. Miles acted with deliberate indifference to HISD employees' violations of the Osborns' constitutional rights, because he knew about those violations, had the authority to stop them, and failed to do so.

334.    Similarly, as also alleged above, *see supra* ¶¶ 261–264, Mr. Niggli acted with deliberate indifference to HISD employees' violations of the Osborns' constitutional rights, because he knew about those violations, had the authority to stop them, and failed to do so.

335.    As further alleged above, *see supra* ¶¶ 265–266, Mr. Niggli, Ms. Ray, and other HISD employees socially transitioned Jane without notifying the Osborns, without seeking their consent, and against their express objections—all while actively concealing those actions from the Osborns.

336.    Individual Defendants did not make any split-second decisions regarding HISD's social transition of Jane but instead had time to plan their decisions, investigate all the relevant facts, and consult with counsel.

337.    Defendants ratified the acts of Individual Defendants, and HISD employees under their supervision, when they did nothing after being notified of their actions.

338.    Defendants also acted with deliberate indifference to the known or obvious fact that constitutional violations would result from HISD policy, practice, custom, and usage.

339.    Additionally, HISD policy, practice, custom, and usage, along with their application to the Osborns, violated and continue to violate the Constitution.

340.    By denying the Osborns procedural due process, Defendants have irreparably harmed the Osborns and, absent an injunction, will continue to irreparably harm the Osborns.

341.    An injunction preventing Defendants from further constitutional violations would not harm them and would be in the public interest.

342.    Defendants' violation of the Osborns' procedural-due-process rights has caused them to suffer damages, including the cost of transportation to meetings with HISD employees, lost income due to attendance at those meetings, and other damages.

343.    As Defendants acted with reckless and callous indifference to the Osborns' constitutional rights, punitive damages are warranted.

## PRAYER FOR RELIEF

The Osborns respectfully request that this Court enter judgment against Defendants and provide the following relief:

A.    A declaration that HISD's policy, practice, custom, and usage, facially and as applied to the Osborns, violate their First and Fourteenth Amendment rights under the United States Constitution;

B.    A preliminary and permanent injunction that requires Defendants to honor the request of the Osborns that Jane will not be referred to by a masculine name or male pronouns.

C.    Nominal damages, compensatory damages, punitive damages, and such other damages to which the Osborns may be entitled;

D.    The Osborns' reasonable attorneys' fees, costs, and other costs and disbursements in this action pursuant to 42 U.S.C. § 1988; and

E.    All other further relief to which the Osborns may be entitled.

Dated: June 23, 2025

Of counsel:

DAVID A. CORTMAN
S.D. Tex. No. 1513783
ALLIANCE DEFENDING FREEDOM
1000 Hurricane Shoals Road N.E.,
   Suite D1100
Lawrenceville, Georgia 30043
(770) 339-0774
dcortman@ADFlegal.org

KATHERINE L. ANDERSON
S.D. Tex. No. 3914569
ALLIANCE DEFENDING FREEDOM
15100 N. 90th Street
Scottsdale, Arizona 85260
(480) 444-0020
kanderson@ADFlegal.org

LAURENCE J. WILKINSON
S.D. Tex. No. 3913887
ALLIANCE DEFENDING FREEDOM
44180 Riverside Parkway
Lansdowne, Virginia 20176
(571) 707-4655
lwilkinson@ADFlegal.org

Respectfully submitted,

/s/ *Vincent M. Wagner*

VINCENT M. WAGNER
   *Attorney-in-Charge*
Texas Bar No. 24093314
S.D. Tex. No. 3162395
ALLIANCE DEFENDING FREEDOM
44180 Riverside Parkway
Lansdowne, Virginia 20176
(571) 707-4769 (direct)
(571) 707-4656 (fax)
vwagner@ADFlegal.org

*Attorneys for Plaintiffs*

45

## VERIFICATION OF COMPLAINT

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the factual allegations in paragraphs 1–30, 36–172, 202–226 of the foregoing are true and correct, and that these statements are based on my personal knowledge.

Executed on June 23, 2025.

Sarah C. Osborn

Sarah Osborn